**BERT et al. v. HELVERING.**

No. 6893.

United States Court of Appeals for the District of Columbia.
Argued June 8, 1937.
Decided June 30, 1937.

492

George M. Wolcott, of Washington, D. C., for petitioner.

Robert H. Jackson, Asst. Atty. Gen., James W. Morris, Asst. Atty. Gen., and Sewall Key, Morrison Shafroth, Bruce A. Low, Norman D. Keller, and W. Croft Jennings, all of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and GRONER and STEPHENS, Associate Justices.

GRONER, J.

This is a tax case arising under the Revenue Act of 1928.[1] Section 13 of the act (26 U.S.C.A. § 13 and note) imposes a tax of 12 per cent. on the net income of every corporation, and section 701(a)(2), 26 U.S.C.A. § 1696(3) and note provides:

"The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The question in this case is whether a group of persons associated together for the purpose of speculating in the stock of Sears, Roebuck & Co. is an association within the meaning of the above-quoted section of the 1928 act. The Board on rehearing held against petitioner on the authority of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 296, 80 L.Ed. 263, and the three companion cases which follow in the same volume (Swanson v. Com'r of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278).

To determine whether the case is governed by those decisions, a brief statement of facts is necessary.

In January, 1928, nine department heads of Sears, Roebuck & Co. of Chicago formed a syndicate to purchase and sell the stock of that company. The syndicate was organized to continue for three years, but its operations actually covered a period of eight months. It made eleven purchases and three sales of the stock and realized a profit of $165,735.54. Each of the members reported his share of the profit in his individual income tax return for 1928 and paid the tax. The syndicate filed no return. The Commissioner assessed a deficiency of $19,383.01 against petitioner as trustee for the syndicate on the theory that the syndicate was an association within the meaning of section 701.

The syndicate agreement was in writing and provided that each member should loan to the syndicate 100 shares of individually owned Sears, Roebuck & Co. stock to provide the means to the syndicate trustee of borrowing money with which to purchase new shares of stock. To each member was to be issued a written certificate of beneficial interest subject to the conditions of the agreement and transferable by indorsement. Certificates of the loaned stock were indorsed in blank, and it was provided that the trustee should borrow money on behalf of the syndicate and sign notes as trustee to secure the payment of all sums borrowed and pledge the shares of stock loaned and the shares thereafter purchased as security, and with the proceeds of the loans should purchase other shares of stock in such amounts and at such times and prices as he should deem best. The trustee was authorized to take title to the shares purchased in his own name as trustee and receive the dividends therefrom. He was further authorized to sell any stock purchased by him at such times and in such

amounts as he should deem best. He was also authorized to assess syndicate members in such amounts as he deemed necessary to provide money for reasonable expenses and interest on borrowed money, and to provide for payments to the banks from which money was borrowed, and to apply the dividends received in payment of the expenses or in payment of the principal of notes given by him for money borrowed; and upon the termination of the syndicate operations and the payment of all obligations, to distribute pro rata in cash the net profits of the operations.

The termination of the syndicate operations was fixed (unless further continued by unanimous consent of the members) as of the end of 1931. There was a provision that if any syndicate member failed to pay in five days the assessment of the trustee, the latter was authorized to forfeit and sell the shares of stock loaned by the member to the syndicate and to apply the proceeds to the payment of the notes of the trustee, and also to forfeit all the interest of the defaulting member in the syndicate assets. The agreement sets out that the enumerated powers of the trustee should be exercised unrestrictedly by the trustee "so far as concerns the public or any person dealing with the trustee other than the syndicate members," and that such persons might rely upon these powers of the trustee—but that as between the trustee and the syndicate, the members should have the right at any time by an instrument in writing signed by all or by vote of a majority to give the trustee such directions as they deemed proper; and in such case the trustee was obligated to follow those directions. There was also a right of removal by a majority vote of the members. As between the trustee and the members, it was agreed that no acts done by the trustee pursuant to the terms of the trust should in any manner impose any personal obligation or liability on him other than for gross or willful wrongdoing, and that if any suit or legal proceeding should be instituted against the trustee arising out of any act done by him under the trust agreement, he should have the right to recover from the members "the costs incurred and reasonable fees of his attorneys for services rendered in any such suit."

In actual practice the syndicate operations were carried on informally. The syndicate agreement, it is said, was gotten up because of the possibility that a death among the members might otherwise terminate the syndicate operations and because the original trustee (who was not a member of the syndicate) wanted security against any financial claim which might arise. The formal certificates of beneficial interest which the agreement provided should be executed by the trustee and delivered to the members were in fact never issued, and the meetings which were held were wholly informal, resulting mostly in discussions of when to buy and sell, which the trustee accepted as suggestions and not instructions.[2]

The Commissioner insists that the syndicate was organized as a continuing business enterprise intended to reap a profit from speculations in stocks; that it enjoyed unity of management, limitation of liability, and continuity of existence as in the case of a corporation and was, therefore, an association taxable as a corporation.

Petitioner, on the other hand, insists that the syndicate was organized simply because the members felt that they could accomplish their purpose best if one person' handled the details and acted as spokesman for the others, and that in these circumstances the syndicate should be classified either as a joint venture or as a partnership.

The broad question involved is not new, but until the recent decisions of the Supreme Court to which we have referred there was much confusion in the answers. It was the recognition of this conflict which led the Supreme Court in 1935 to consent to review four cases which were thought to embrace the whole range of the question. In the Morrissey Case, supra, the court laid down what it called in the Swanson Case, which followed, the governing principles. And so we get back to the question: Do those principles apply here?

The opinion in the Morrissey Case first reviews Crocker v. Malley, 249 U.S. 223, 39 S.Ct. 270, 63 L.Ed. 573, 2 A.L.R. 1601. That case arose under the income tax act of 1913 (38 Stat. 114, 166, 172, § 2, subd. G(a), which taxed "every corporation, joint-stock company or association" not including partnerships. The theory of the tax there imposed was that the trust was a

---

[2] But the Supreme Court in Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, at page 374, 56 S.Ct. 285, 80 L.Ed. 278, has said that "the instrument" under which the parties operate is the test.

joint-stock company. The opinion, written by Justice Holmes, follows and adopts the reasoning of the Massachusetts courts defining strict trusts and partnerships, and makes the distinction turn upon the question whether in the trust agreement the beneficiaries had or had not substantial control of the management. Where there was control there was partnership; where there was no control there was a strict trust. The holding was that the agreement there constituted a trust and not a joint-stock company. But in Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949, the court re-examined the question decided in Crocker v. Malley and rejected the tests of control or noncontrol as determinative. The Hecht Case involved the special excise tax imposed under the Revenue Act of 1918[3] in language practically the same as the income tax provision involved here, and generally speaking it was held there that the word "association" as used in the act should be construed to mean a body of persons united without a corporate charter, but upon methods and forms used by incorporated bodies in the prosecution of some common enterprise. The case was decided in 1924. The Morrissey and companion cases followed in 1935. Each of them involved construction of the word "association" as used in the tax acts of 1924, 1926, and 1928. In the Morrissey Case the court says the so-called "control test" led to much litigation and that the change in the Treasury Regulations after the decision in Hecht v. Malley increased the uncertainty. To settle this, the court announced the governing principles in the following words:

"What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains— which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act 'in much the same manner as directors,' may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking.

"It is no answer to say that these advantages flow from the very nature of trusts. For the question has arisen because of the use and adaptation of the trust mechanism. The suggestion ignores the postulate that we are considering those trusts which have the distinctive feature of being created to enable the participants to carry on a business and divide the gains which accrue from their common undertaking, trusts that thus satisfy the primary conception of association and have the attributes to which we have referred, distinguishing them from partnerships. In such a case, we think that these attributes make the trust sufficiently analogous to corporate organization to justify the conclusion that Congress intended that the income of the enterprise should be taxed in the same manner as that of corporations."

Applying these tests here, we find from the facts stated a group of individuals organized to carry on a business enterprise for profit; continuity of existence; centralized management; title to the property in a single trustee who is charged with the conduct of the enterprise in the same manner as directors of a corporation; and provision for the transfer of beneficial interests and the introduction thereby of new parties. The only element not clearly present in this case is limitation of liability.

[3] 40 Stat. 1057.

Indeed, the case we have is distinguishable only on this single point from Swanson et al., Trustees, v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (heretofore spoken of as one of the companion cases to the Morrissey Case). That case, like this, involved an Illinois trust. It involved a plan to operate in a single parcel of land —here, in a designated stock. There the trustees were absolute managers of the trust. Here, on the other hand, the trustee in his relations with the members was not the absolute manager. This distinction is stressed by petitioner. He says that by the Illinois decisions where under the provisions of the trust instrument the unit holders have authority to direct the trustee, a partnership liability exists, and it is only where under the articles of association the beneficiaries have no control, that partnership liability is absent, and therefore that in a trust like this there can be no limitation of liability.[4]

But granting that this is the effect of the Illinois cases, we think it is no more than the recognition of and adoption of the Massachusetts rule. See Williams v. Johnson, 208 Mass. 544, 95 N.E. 90; Williams v. Milton, 215 Mass. 1, 102 N.E. 355. And, as we have seen, the Supreme Court has expressly abolished the control test as a factor in applying the provision of the income tax law applicable here, but instead has substituted as a more accurate test the question whether the method adopted for carrying on the enterprise most resembles that of an incorporated body. And this "concept" of association has been carried into the Treasury Regulations,[5] where it is provided that associations, by whatever name known, include all such which act or do business in an organized capacity, even though under the state law such organizations are technically partnerships.

While, therefore, it is true that the Supreme Court in all four cases in 296 U.S. mentions limitation of liability as one of the characteristics of the trusts declared in those cases to be associations under the law, and while in this case the right of the beneficiaries or the trustee to limitation of liability may perhaps be challenged, as to which we need express no opinion, we think this is not the vital and conclusive factor under the terms of the tax act, or that the Supreme Court intended in its four opinions to make it an indispensable element in cases of this sort. Indeed, if each of the elements named by the Supreme Court in the Morrissey Case be considered as essential, the whole would make as complete a corporate form as would be true under a charter of incorporation. The only missing link would be the charter itself. We think the real test is whether the enterprise more nearly resembles in general form and mode of procedure a corporation than a partnership. Here, if that be true, there can be no doubt of the answer, for certainly the instant trust lacks most of the outstanding characteristics of a partnership —though it may also lack one of the features of a corporation. Here there is no lack of continuity—for the death of one of the members would not work a dissolution. Here there is no right of one member to bind the association property, and here no one member owns an individual nontransferable interest in the trust estate. We think, as was said in Commissioner v. Brouillard (C.C.A.) 70 F.(2d) 154, that where an entity of this kind resembles a corporation in some respects and a partnership in others, the features of similarity should be compared and the marks of dissimilarity contrasted. The resemblances should be balanced. It should be determined by that test the one to which the enterprise is predominantly akin in the method, mode, and form of procedure in the conduct of its business. This is what we think the Supreme Court meant when it said in the Morrissey Case, "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity."

Here the resemblance to the corporate form is predominant. Here the parties formed themselves into a syndicate or a trust—whichever it may be called—for the purpose of dealing in the market in securities. Under the cases, this joint undertaking was a business enterprise. There was absent in their scheme the mutual agency of a partnership, and they enjoyed the advantages of centralized control, continuity of existence as an organization, and transferability of divisible shares of beneficial interest—all characteristics of corporate organization. And even though they did not secure that other characteristic of corporate organization—limitation of liability —they were still predominantly "a body of persons united without a charter, but upon the methods and forms used by incorporat-

---

[4] Schumann-Heink v. Folsom, 328 Ill. 321, 159 N.E. 250, 58 A.L.R. 485.

[5] Articles 1312, 1313, Regulations 74 under Revenue Act of 1928.

ed bodies for the prosecution of some common enterprise."

The hardship here is no greater than in the cases in the Supreme Court and, though we might have viewed the matter differently if it were a question of first impression, we feel bound under our interpretation of the ruling in those cases to affirm the decision of the Board.

Affirmed.