### BLOOMFIELD RANCH et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 11643.

Circuit Court of Appeals, Ninth Circuit.

April 20, 1948.

Rehearing Denied May 24, 1948.

O. K. Cushing, Eustace Cullinan and Delger Trowbridge, all of San Francisco, Cal., for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen., Helen R. Carloss, Harry Baum and I. Henry Kutz, Sp. Assts. to Atty. Gen., for respondent.

Before GARRECHT, MATHEWS and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

The Respondent determined that the Petitioners constituted an association taxable as a corporation under Section 3797(a) (3) Internal Revenue Code, 26 U.S.C.A. Int. Rev.Code, § 3797(a) (3), and claimed for the taxable year 1940 a deficiency of $6,646.60 in income tax and $4,159.58 declared value excess profits tax.

The Petitioners, claiming that their organization is a partnership under Section 3797(a) (2) Internal Revenue Code,[1] and not a corporation, petitioned the Tax Court to redetermine the tax deficiency.

There is no dispute about the amounts. The Petitioners admit owing the amounts if it be adjudged that they are a corporation; if they are a partnership, the members owe nothing.

The petition was submitted to the Tax Court on written stipulation of facts, exhibits and on oral testimony. The stipulation of facts was adopted as part of the findings by the Tax Court and incorporated therein by reference. On such findings the Tax Court sustained the Commissioner's determination.

Whether the enterprise was an association of individuals for the purpose of carrying on a business, as contended by the Respondent, or whether, as contended by the Petitioners, they were joint venturers and tenants in common of real property with a common agent for the sale thereof, is a question which must be decided according to the particular facts of the case, and more particularly, pursuant to the agreement executed by the parties.

In their specifications of errors the Petitioners assert that the Tax Court erred in its findings and conclusions based thereon. The following facts appear from the Tax Court's findings:

Clayton Company, a California Corporation, has been engaged in the business of real estate agent and broker since 1903; it sold "a lot of land in and around the Miller & Lux holdings in the three counties" of Santa Clara, San Benito and Santa Cruz, California. It formed the opinion that Bloomfield Ranch, comprising 21 separate parcels of land and containing about 27,500 acres, in said counties, which were owned by the Miller & Lux, Inc., could be bought for profitable reinvestment. After negotiating with the owner for about a month, on January 28, 1926 it paid $50,000 to that corporation as a deposit for the land. It then induced thirteen customers of the company to join with it in the purchase of said land. The only "agreement" of the parties was represented by fourteen separate instruments each executed by Clayton Company, designated as "Operator" and the thirteen persons, acting individually and not as a group, and each called "Investor". Each instrument, copy of which follows, acknowledged receipt of the sum of $50,000 by the Operator from the Investor and contained all of the terms, conditions and purposes of the enterprise:

"$50,000.00   San Jose, Cal., March 10, 1926

This is to acknowledge receipt by the

[1] § 3797, Title 26, Internal Revenue Code, Definitions:

"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\*       \*       \*       \*       \*       \*

"(2) Partnership and partner. The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization."

undersigned, James A. Clayton & Co., a corporation of San Jose, Cal., hereinafter called the 'Operator,' from J. P. Dorrance of San Jose, hereinafter called the 'Investor,' of the sum of Fifty Thousand ($50,-000.00) Dollars, which sum is so received by, and paid to, said corporation on the terms and conditions and for the purposes, as hereinafter set forth and not otherwise, to-wit:

The Operator is to use said sum, together with other sums contributed by thirteen other persons, who are also referred to herein as 'Investors' and other sums borrowed or advanced by said Operator—the unpaid portions thereof, may be re-borrowed or renewed, and security given—in the purchase of certain lands and interests, in the counties of Santa Clara, San Benito and Santa Cruz, California, belonging to Miller & Lux, Inc., and consisting of approximately 27,000 acres of land, together with divers rights, appurtenances and easements as described in three deeds to M. E. Thomas dated March 3rd, 1926, and recorded March 10th, 1926, in Santa Clara, San Benito and Santa Cruz Counties, Cal.

The Operator is to take and hold title to said properties originally in the name of M. T. Thomas; but may take such title in the name of any other person, corporation or concern, or in its own name; and may have such title conveyed, from time to time, to other persons, corporations or concerns, or otherwise conveyed or held, as the Operator may desire, in trust for the said 14 investors above referred to, for the profitable resale thereof,

The Operator may sell, convey, hold, lease for one season only, or in any otherwise deal with and treat said properties as the sole and absolute owner thereof in fee simple, and without let or hindrance from the Investor, or any of the Investors, less than the full number thereof, or any other person or concern, whatsoever. But may not exchange, encumber, nor lease except as above specified, nor sell trees, wood or improvements off from said property without the consent of the investors.

The Operator may, from time to time, incur such costs, expenses and charges in connection with the acquiring, holding, renting, selling or protecting of said properties, as it may deem proper; and the fact of the Operator incurring such cost, expense or charge, shall conclusively establish the propriety and legality thereof.

The Operator shall keep true and accurate books of account, in which shall be set down, from time to time, all moneys paid out and charges, expenses and costs incurred in the premises, and all sales made and properties disposed of, and moneys or other things of value received by it in the premises.

Out of the moneys received from sales or renting or other sources of said properties, the Operator shall first retain for its own use and benefit, a .commission of five per centum (5%) on the gross selling price of each parcel sold, as sales are made, and from the net proceeds of such sales, after deduction of its commissions, the Operator shall pay all costs, expenses, and charges paid or incurred by it in the premises and all moneys advanced or borrowed by it, together with interest thereon.

From any residue of moneys remaining in the Operator's hands, after all the foregoing payments have been made, the Investor shall be entitled to have returned to him, at the same time, and in equal amounts, as are returned to the other Investors, the whole or such part of the said sum herein receipted for, as may, in the judgment of the Operator, be safely paid, without jeopardy to any remaining properties or assets, not yet converted into cash; but no Investor shall be entitled, as of right, to any payment or return, or repayment before said properties and the proceeds thereof, have been converted into cash, and all such commissions, debts, advances, costs, charges and expenses have been fully paid, provided, however, that upon the payment of the debts, taxes and charges accrued, such funds shall be distributed equally to said Investors whenever there shall be a net amount of $7000 or more on hand.

When, as, and if all of said properties, and all properties, and all proceeds therefrom shall have been sold and converted into cash, and all such commissions, debts, advances, costs, charges and expenses shall have been fully paid, and all mon-

eys advanced by the Investors shall have been fully repaid, all moneys, if any, then remaining in the hands of the Operator arising out of such transactions, and not applicable to any of the foregoing requirements, shall be, by said Operator, paid to and divided among the Investors, in equal shares to each of them, their heirs and assigns.

It is authorized, understood and agreed, however, that the Operator has charged, and is entitled to a commission of Fifty Thousand ($50,000.00) Dollars for the negotiation, purchase and consummation of sale of said properties from Miller & Lux, Inc., to said M. E. Thomas, which is in addition to commissions to be credited to it for subsequent resales, and which shall be added to, and included in charges and expenses of the transactions herein provided for, and accounted as part of the original purchase price of said properties.

The Investor shall be entitled to have an account rendered to him by the Operator, of all transactions hereunder, on demand, but not more often than once each sixty days.

These presents are executed in duplicate by the Operator and the Investor, the day and year set out at the opening hereof, and shall be binding upon the successors, heirs, representatives and assigns of each of them.

James A. Clayton & Co.,
By Frazier O. Reed,
Its President.
W. S. Clayton, Its Secretary. Operator.
J. P. Dorrance, Investor."

The tracts which were widely scattered, had been operated by Miller & Lux as one going concern for raising cattle and feed and for conducting some farming operations. Thousands of head of cattle were handled, and at times as many as 200 men were employed. When the lands were acquired by the Operator there were leases existing which yielded rents of $34,041 in 1926. From 1926 to 1930, inclusive, 90 percent of the property, about 24,828 acres, was sold for the total sum of $1,452,326. The loan of $585,000 borrowed by Clayton Company to complete the sale, was paid in 1927 and there then remained 2,672 acres

unsold. After 1930, because of the depressed condition of the real estate market, the only sales made were 60 acres for rights of way for public services. From 1941 to 1944, 1,112 acres were sold and at the end of 1944, 1,500 acres remained unsold.

From 1926 through 1940, the operations of the Clayton Company, as Operator, consisted of farming, renting and selling property; renting parcels under one year leases subject to renewal, keeping some of the acreage under cultivation in wheat and barley until the parcels were sold; collecting rents and payments of principal and interest on installment sales; paying taxes, disposing of produce raised on the farms, and in general, taking care of the financial and accounting aspects of the enterprise.

Distributions totaling $98,250 have been made to each holder of the fourteen units, or $1,375,500, which represents return of the original $700,000 capital plus profits from all operations.

There were no exchanges of the Bloomfield property or investments in other property. Clayton Company managed the operations without direction or advice of the Investors; its president did discuss progress with the Investors when he saw them, individually. On three occasions he called them to meet to discuss income tax problems arising out of their setup.

There were originally fourteen investors and each had a fourteenth interest in the business. Changes occurred in the interests due to death and to transfers and sales of all or part of a one-fourteenth interest so that now there are nineteen investors holding the original fourteen shares.

Whenever any change in interest was made, Clayton Company was notified and made formal acknowledgment and record of the change in interests. The original agreement of each investor had attached to it the endorsement of any assignment or transfer of all or part of his interest which showed how the transfer came about or was made.

In affirming the determination of the Commissioner, the Tax Court stated the question is controlled by Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.

Ed. 263; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Huron River Syndicate v. Commissioner, 44 B.T.A. 859; Helm & Smith Syndicate v. Commissioner, 9 Cir., 136 F.2d 440; Bing & Bing, Inc. v. Commissioner, 35 B.T.A. 1170; Kilgallon v. Commissioner, 7 Cir., 96 F.2d 337, certiorari denied 305 U.S. 622, 59 S.Ct. 83, 83 L. Ed. 397.

It is the petitioners' contention that this case is governed by Commissioner v. Gerstle, 9 Cir., 95 F.2d 587, in which this court held the syndicates involved therein to have created a joint venture within the definition of a partnership under the Internal Revenue Code.

In support of this contention it is argued that there was no inter-relation between the Investors; that each Investor separately was a principal and Clayton was his agent; that there was no semblance of an organization and therefore no resemblance to a corporation; that each Investor had a separate equitable estate in the land purchased and that all of them were tenants in common. They are very insistent in their argument and also in their specification of errors[2] that there was no joint activity contemplated and that each party entering the plan did so separately and on his own initiative and not jointly with the others.

Since the Tax Court failed to find there was joint activity, we take this fact to be true. However, we do not see how this contention strengthens petitioners' case. Rather, we believe that if such a finding had been made, it would have been an element necessary to consider in establishing the position contended for by them.

Although the cases on this subject present a very vexatious problem, not easily resolved, and much confusing language has been used in pronouncing the criteria to be followed in deciding them, we do not think that the federal courts in decisions involving the identity of an organization as a partnership under the Internal Revenue Code have willfully ignored or denied the basic concepts of a partnership under general principles of law.

■■ Just as an "association" has been defined to "imply associates and entering into joint enterprise",[3] so does a partnership or joint venture imply an association and entering into a joint enterprise. But the latter association conceives the intentional combination and joint endeavor of the parties interested in a common enterprise for their mutual benefit, and not merely the appearance of combination or collective action by accident. A single or isolated and non-continuing undertaking usually constitutes the distinguishing feature between a joint venture and a partnership, but the element of collective and conjunctive action for the mutual benefit of all engaged therein is necessary in both.[4]

In Commissioner v. Gerstle, supra, this Court recognized and stressed the importance of intentional joint action and combination of effort in the undertaking there involved. This may be gathered from the following excerpts taken from its statement of facts:

"The respondent and his associates decided to purchase properties * * *. Four syndicates in all were organized * * *, the members contributing to a pool to be used for the purchase of the properties thereafter acquired.

" * * * It was recited that the syndicate members are desirous of acting jointly in the purchase, management, and sale of real properties * * *.

" * * * * The agreements were to be executed in any number of counter-

---

[2] "6. The Tax Court erred in failing to find that there was no agreement by the Investors with one another.

"7. The Tax Court erred in failing to find that the Investors had no meeting before they signed the respective agreements with Clayton and that some of them did not know who the others were."

[3] Morrissey v. Commissioner, supra.

[4] As stated by the United States Supreme Court in Commissioner v. Tower, 327 U.S. 280, 286, 66 S.Ct. 532, 535, 90 L.Ed. 670, 164 A.L.R. 1135: "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses."

See also Tompkins v. Commissioner of Internal Revenue, 4 Cir., 97 F.2d 396.

parts, each constituting a single agreement. * * *

"While the agreements gave the managers broad and exclusive powers, the practice was to decide all questions of importance only after the views of all concerned had been obtained."

We have considered the lack of interrelation between the parties here and have noted it as an element of dissimilarity between this and the Gerstle case.

Besides this, however, the cumulative effect of the facts hereinbefore stated, leaves much room for doubt that there was either the intent to create or that the agreement between the Investors did create the relationship of a partnership or joint venture in the conduct of the enterprise entered into. In Commissioner v. Tower, supra, 327 U.S. at page 287, 66 S.Ct. at page 535, the Court said:

" * * * When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.' [Cases cited.] We see no reason why this general rule should not apply in tax cases where the Government challenges the existence of a partnership for tax purposes." [5]

Although the Tower case, supra, involved a "family" partnership, we do not see why the element of intent should not apply to the case here—and which is another factor which we have found lacking.

The petitioners object to the use of the term "liquidating trust" in connection with their enterprise and claim that theirs was a mere "naked resulting trust". They contend that they were equitable owners of the property as tenants in common and that therefore their status was analogous to the Gerstle case.

In its well considered opinion the Tax Court held that the Investors were not given any undivided interests in the realty: that their interests were only personal claims against the Operator and were limited to the right to receive distribution of the net profits to be derived from the operation.

We agree with this conclusion. The agreement of the parties definitely so provides. Also, the treatment of the agreement by the Investors, especially for the purpose of transfer and sale, strongly indicates that each Investor considered his interest personal and not real property.

Nor can we agree with the Petitioner's statement that the Investors each individually appointed Clayton as their agent. While the Operator, no doubt, was in a sense the representative of the Investors in carrying on the plan, it cannot fairly be said that its acts were performed as an agent. Except for the insignificant restrictions that it could not sell trees, wood or improvements off the property without the consent of the Investors, or lease for more than one year (the property was to be kept in condition for ready sale), the Operator could and did act independently of the Investors pursuant to the needs of the moment, and its acts in that respect were beyond their control. Both the testimony of the witness for petitioners and the agreement establish this as true without doubt. Further, the evidence is clear that the members lacked power to bind the association in any way, and except for two occasions in order to discuss the question of income taxes, no meeting of the Investors was held to determine business policies.

In Bert et al. v. Helvering, 67 App.D.C. 340, 92 F.2d 491, 495 the Court said:

"We think, as was said in Commissioner v. Brouillard 10 Cir., 70 F.2d 154, that where an entity of this kind resembles a corporation in some respects and a partnership in others, the features of similarity should be compared and the marks of dissimilarity contrasted. The resemblances should be balanced. It should be deter-

---

[5] See also Porter v. Cooke, 5 Cir., 127 F.2d 853, certiorari denied 317 U.S. 670, 63 S.Ct. 75, 87 L.Ed. 538.

mined by that test the one to which the enterprise is predominantly akin in the method, mode, and form of procedure in the conduct of its business. This is what we think the Supreme Court meant when it said in the Morrissey case, 'The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity.'"

In evaluating the contrasting features between this case and the Gerstle case, supra, on which the petitioners so strongly rely, we find that in the conduct of the business the petitioners were not a partnership or joint venture.

We are in accord with the Tax Court that in organization and manner of operation this enterprise is an association within the ambit of the principles laid down in the Morrissey case and companion cases decided by this and other courts wherein the question of analogy of taxable entities was presented.[6] No useful purpose would be served by an elaborate survey of these cases. However, suffice it to reiterate that whether the undertaking is sufficiently analogous to a corporation to justify taxation of its income as such depends on whether it possesses the following corporate attributes:

1. Continuity of enterprise.

The termination or interruption of the enterprise by the death of the owner of a beneficial interest is one of the principal distinguishing features, as laid down by the Morrissey case, between a partnership and a corporation. Here the continuity of the organization was insured by the agreement which was binding on the "successors, heirs, representatives and assigns" of each Investor. Death could not and did not interrupt the conduct of the business.

2. Transferability of interests.

Another very important element of distinction between a partnership and a corporation is the restricted transferability of the interests and the introduction of other members. Here the interests of the fourteen original Investors were transferable and have been transferred in whole or in part by sale or assignment. The evidence shows there are now nineteen Investors holding varying portions of the original shares.

3. Centralized management.

The agreement and the testimony of Mr. Reed, President of Clayton Company, leaves no room for doubt that management was centralized in Clayton Company, the Operator.

4. Continuity of Title.

The agreement authorized the Operator to take title to the real property in the name of its employee, Thomas, or "in the name of any other person, corporation, or concern, or in its own name."

5. Holding and operating property for profit.

The operator's function was not one of conservation of assets merely. The very essence of the business engaged in was the purchase of property "for reinvestment". The language of the agreement itself provides for "the profitable resale thereof", and further: "The Operator may, from time to time, incur such costs, expenses and charges in connection with the *acquiring, holding, renting, selling or protecting of said properties,* as it may deem proper." (Emphasis supplied.) The evidence is clear that the Operator engaged in and performed all of these functions in connection with the land at a good profit.

We are of the opinion that the facts of this case are sufficient to support the findings of the Tax Court that the petitioners were associated as a corporation within the meaning of the tax laws. Its decision is affirmed.

---

6 United States of America v. Homecrest Tract, et al., 9 Cir., 160 F.2d 150; Helm & Smith Syndicate v. Commissioner, 9 Cir., 136 F.2d 440; Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Title Insurance & Trust Co. v. Commissioner, 9 Cir., 100 F.2d 482; Sloan v. Commissioner, 9 Cir., 63 F.2d 666; Wabash Oil & Gas Ass'n v. Commissioner, 1 Cir., 160 F.2d 658; National Metropolitan Bank v. Commissioner, 4 Cir., 145 F.2d 649; Fletcher v. Clark, 10 Cir., 150 F.2d 239, certiorari denied 326 U.S. 763, 66 S.Ct. 144, 90 L. Ed. 459.