**GUARANTY EMPLOYEES ASSOCIATION, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15980.**

United States Court of Appeals Fifth Circuit.

Jan. 18, 1957.

Rives, Circuit Judge, dissented.

William H. Bloch, Corpus Christi, Tex., for appellant.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., Harry Baum, Davis W. Morton, Jr., Attys., Dept. of Justice, Washington, D. C., Gordon J. Kroll, Asst. U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

The district court held that appellant was not entitled to federal income tax exemption as a "mutual savings bank," within the meaning of Section 101(2) of the Internal Revenue Code of 1939,[1] and

1. "§ 101. Exemptions from tax on corporations.

"The following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \*

that it was an "association" taxable as a corporation, within the meaning of Section 3797(a) (3).[2] Even though it should not come within the mutual savings bank exemption, this association would still not be subject to tax as a corporation unless it falls within the definition of association under this section.

The pertinent facts are not in dispute. Guaranty Employees Association was organized in 1939 for the exclusive benefit of employees of Guaranty Title & Trust Company of Corpus Christi, Texas. The latter company, hereinafter called Guaranty Title, is primarily a title insurance and trust company managing and investing in real estate in the Corpus Christi area. It had frequent requests from its employees for small loans, and it encouraged the creation of Guaranty Employees Association to take care of that need and further to encourage thrift, establish a savings plan among the employees, and to promote cooperation, loyalty, continuity of employment and better employer-employee relations in general.

On August 2, 1939, some 43 employees of Guaranty Title met in its offices and, without incorporating, adopted a constitution and by-laws for Guaranty Employees Association.

Membership is limited to employees of Guaranty Title and is represented by units of $50.00 each purchased only for cash.[3] No more than fifty units can be purchased by any one person, that is the maximum deposit of any member is $2,-500.00. The units are nontransferable. Passbooks are provided for to evidence deposits and withdrawals but with no checking privileges or transfer rights.

Each unit of deposit entitles the member to one vote at the annual meeting of the members. An employee leaving the employment of Guaranty Title must withdraw from the association, except that an employee who has been a member of the association for at least five consecutive years prior to retirement and who does not accept employment elsewhere may allow his or her investments to remain with the association so long as he or she lives and continues unemployed. Upon a member's death, the interest of any minor child may remain with the association until the child reaches legal age, and the surviving spouse may allow his or her interest to remain with the association during the remainder of his or her natural life.

General management and control of the business affairs of the association is lodged in an Executive Committee elected by the members at their annual meeting. No compensation is paid to the management and Guaranty Title furnishes office space rent free. Title to properties purchased is carried in the name of Guaranty Title as trustee, and the funds of the association are held likewise. Guaranty Title performs such ministerial duties as receiving money, paying money, handling membership accounts and distributing earnings, all for a commission of two per cent of the gross receipts.

At the end of each fiscal year, on March 31, the value of each unit is determined and fixed by the Executive Committee by adding thereto the unit's proportionate interest in the association's anticipated profits for the year, per the books. In the event of losses, all units share in such losses in proportion to their value as fixed by the Executive Committee. At the end of each fiscal year a reserve of five per cent of the year's net earnings is set aside for

---

"(2) Mutual savings banks not having a capital stock represented by shares; * * *."

53 Stat. 33, 26 U.S.C.A. § 101 (4) (c) (I.R.C.1939).

2. "§ 3797. Definitions
   "(a) When used in this title, where not otherwise distinctly expressed or

manifestly incompatible with the intent thereof—
   *   *   *   *   *
   "(3) Corporation. The term 'corporation' includes associations, joint-stock companies, and insurance companies. * * *"

26 U.S.C.A. § 3797(a) (3) (I.R.C.1939).

3. Units can be paid for by installments of as little as $5.00 per month.

contingencies, with the unused portion of the prior year's reserve for contingencies being added back to the current year's net earnings for distribution to members. All earnings, after expenses, have been paid to the association's members.

The constitution provides that, "The Committee shall make loans, discount notes, purchase property, and invest funds, after the manner prescribed in the By-Laws of this Association." The by-laws provide that:

"The Executive Committee may purchase outright stocks, bonds, real estate, leases, or other things of value which, in the opinion of its members will constitute a sound and profitable investment upon unanimous vote of the Executive Committee. * * *

"From time to time it may be necessary for the Association to borrow money from the Banks for the purpose of purchasing investments. Since the Association as such will be unable to obtain such loans from the Banks it will be necessary that certain members of the Association as individuals obtain said loans and execute notes and obligations to the Bank for such loans. Where loans are authorized by the Executive Committee and are obtained in this manner for the benefit of the Association, it shall indemnify the person or individual members executing such notes, against any loss to the extent of its total assets."

Investment of the association's funds in real estate came about naturally. That was the type of investment with which the management and employees of Guaranty Title were most familiar. In 1943, the Executive Committee purchased a tract of land in what was then considered the remote south side of Corpus Christi, Texas, at a price of $300 per acre. The land was low and needed to be drained and the Committee felt that by draining it an immediate profit of $200 per acre could be obtained. In 1945, however, the association decided to sub-divide this tract because of a change in conditions occurring since its acquisition due to the unusual growth enjoyed by Corpus Christi and the land's proximity to the Naval Air Station established immediately prior to and during World War II. Immediately after the war, when materials became available for residential construction, this land was subdivided and the lots were sold. In 1949, 1950, and 1951 the association acquired other residential business lots, some improved, others unimproved. In some cases improvements were added by the association. In some cases the acquisition was by purchase, others by foreclosure. These purchases were made in accordance with the practice of keeping the association's funds invested. During the tax years here in question no land was subdivided. The only tract ever subdivided is the one purchased in 1943 as raw acreage which had to be drained. The bulk of these lots were sold off prior to the tax years here involved.

After subdividing the tract purchased in 1943, the association filed federal income tax returns as an "association" taxable as a corporation. With respect to its fiscal years ended March 31, 1949, 1950, and 1951, for which such corporate taxes had been paid, the association filed claims for refund on the theory (1) that it was exempt as a "mutual savings bank," or (2) that it was not an "association" taxable as a corporation. These claims were disallowed by the Commissioner, and this suit for refund followed. The district court on cross-motions for summary judgment sustained the Commissioner's determination, holding that taxpayer was not exempt from federal income tax and was an "association" taxable as a corporation.

The plan of organization of Guaranty Employees Association had been suggested by an employee who had formerly worked for San Jacinto Trust Company and who furnished to the management of Guaranty Title copies of the constitution, by-laws, and deposit books used by the

San Jacinto Employees Association. In turn, that association had been patterned after A-C Investment Association operated for the benefit of the employees of Anderson, Clayton Company of Houston, Texas. The Court of Appeals for the District of Columbia had, in 1933, held the A-C Investment Association exempt from federal income taxation as a "mutual savings bank" within the meaning of Section 231(2) of the Revenue Acts of 1921, c. 136, 42 Stat. 227; 1924, c. 234, 43 Stat. 253; and 1926, c. 27, 44 Stat. 9.

A circular to the members of the A-C Investment Association had stated its objects and policies as follows:

"This Association is an unincorporated mutual savings institution. Funds received from members in payment for units of interest are invested in conservative real estate mortgage and high-class bonds." A-C Inv. Ass'n v. Helvering, 62 App. D.C. 339, 68 F.2d 386, 387.

Its actual investments were indicated by its assets, thus stated in the opinion:

"The assets consisted of real estate notes purchased through trust companies and trust departments in banks, stock in building-loan associations, first mortgage loans made direct to borrowers, a comparatively insignificant amount loaned to members on passbooks, and cash to meet withdrawals of deposits." A-C Inv. Ass'n v. Helvering, supra, 68 F.2d at page 387.

Appellant urges that the laws of Texas do not regulate investments of mutual savings banks, that it meets the requirements of Treasury Regulation 111, Sec. 29.101(2),[4] and that the Treasury Regulations are silent as to the type of investments which might or might not affect exemption as a mutual savings bank. Appellee points to O.D. 780, 4 Cum.Bull. 262 (1921), as the administrative enjoinder that an organization which receives its members' deposits and operates the fund for speculation cannot qualify as an exempt mutual savings bank. Appellant insists that its investments were not speculative, and the record may support that insistence. The evidence shows that the association has never sustained a loss on an investment; and, even further, that Guaranty Title, the employer, has never sustained any serious losses in connection with land transactions, though, in its corporate capacity and in its fiduciary capacity, it has bought and sold millions of dollars worth of real estate and manages additional millions of dollars of real estate.

Whether engaged in speculatively or conservatively, however, it is generally beyond the powers of even a commercial bank to engage in the business of buying, developing and selling real estate beyond the extent to which real estate transactions are necessary to enable the bank to protect itself against loss on loans made by it. See 7 Am.Jur., Banks § 162 et seq. Whether the character of the association is determined by its constitution and by-laws,[5] or by what it actually did,[6] we think that appellant association was more than a mutual savings bank.

4. "Mutual Savings Banks.—In order that a corporation may be entitled to exemption as a mutual savings bank, it must appear that it is an organization—
(1) Which has no capital stock represented by shares, and
(2) Whose earnings, less only the expenses of operation, are distributable wholly among the depositors.
If it appears that the organization has shareholders who participate in the profits, the organization will not be exempt. A mutual savings bank need not be incorporated or be under public supervision, unless, in either case a State statute so requires, nor need it serve the public in general, in order to be exempt. It may confine its business to a designated class of individuals, such as employees of a single corporation, without losing its exempt status. * * * "

5. See Morrissey v. Commissioner, 296 U.S. 344, at page 361, 56 S.Ct. 289, 80 L.Ed. 263; Helvering v. Coleman-Gilbert, 296 U.S. 369, 373, 374, 56 S.Ct. 285, 80 L.Ed. 278.

6. Weiss v. Stearn, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001.

■ Clearly, the exemption of a mutual savings bank does not depend on local law, but applies with nation-wide uniformity.[7] And though not expressly so stated in the Treasury Regulations (footnote 5, supra), the federal case law has settled beyond peradventure the fact that an organization which engages directly in the business of buying and selling real estate, or indeed in any business other than receiving deposits and loaning or investing the same for the benefit of the persons making the deposits is not a mutual savings bank.[8] We conclude that this entity does not come within the exemption of Section 101(2), supra, as a mutual savings bank.

With the statement of the case and the first conclusion, Judge Rives and the writer are in agreement. Judge Hutcheson is of the opinion that the association meets the test of a mutual savings bank as delineated in A-C Inv. Ass'n v. Helvering, supra. The opinion to this point has been written by Judge Rives. Differing as we do as to the answer to the second question, and thus as to the decision of the case, the remainder of the opinion states the views of Judge Hutcheson and the writer only.

We come then to the second question of whether appellant was an "association" taxable as a corporation, within the meaning of Section 3797(a) (3) [footnote 2, supra]. In A-C Inv. Ass'n v. Helvering, supra, the question of whether that organization was an association taxable as a corporation did not have to be decided in view of its exemption in any event, but did receive brief treatment in the closing paragraph of the opinion:

"That petitioner is not a corporation is obvious; nor is it a trust, because there was no original fund to administer; nor is it an association in the nature of a corporation, though in many aspects it may resemble a corporation.

"But the question whether it is or is not a corporation is not the issue, because the statute does not make that the test. The question is whether it is a savings bank, and the answer to that question depends, not upon its name or upon its incorporation or nonincorporation, * * *." 68 F.2d at page 390.

Congress has established two mutually exclusive categories of business enterprises, characterized generally as "partnerships" and "corporations" and delimited as follows:

Internal Revenue Code of 1939, Sec. 3797(a):

"(2) Partnership * * *. The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; * * *.

"(3) Corporation. The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The line between "other unincorporated organization," which is treated as a partnership, and "associations," which are taxed as corporations, is not clearly drawn.

In the case of Morrissey v. Commissioner of Internal Revenue, 1935, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, and in its four companion cases, the Supreme Court suggested certain criteria that would mark an enterprise as having substantial enough resemblance to a corporation to be taxed as one. These are: (1) Ownership of property as an entity;

7. Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119; Mertens Law of Federal Income Taxation, Vol. 10A, §§ 61.09, 61.14.

8. Bank for Savings v. The Collector, 3 Wall. 495, 70 U.S. 495, 513, 18 L.Ed. 207; Oulton v. Savings Institution, 17 Wall. 109, 84 U.S. 109, 120, 21 L.Ed. 618; A-C Inv. Ass'n v. Helvering, supra.

(2) centralized management; (3) unaffected by death of beneficial owners; (4a) easy transferability of beneficial interests and (4b) ability to include large numbers of participants; and (5) limitation of personal liability of beneficial owners.

It should be noted that the Morrissey case was concerned not so much with drawing a line between partnership type and corporate type enterprises as with determining what type of business trust should be characterized as "associations." In all of the four companion cases all five of the enumerated characteristics were present and it was consequently not made clear what the effect of the absence of one or more might be, though it appears that since the purpose of referring to these criteria is to establish a substantial resemblance to a corporation, if too many corporate features are missing or are present only slightly the resemblance will become too faint for the imposition of corporate taxes.

Subsequent Courts of Appeals cases have stated, sometimes in dicta, that where merely the feature of limited liability (#5) is absent the enterprise might still be an "association," Bert v. Helvering, 67 App.D.C. 340, 92 F.2d 491; Del Mar Addition v. C. I. R., 5 Cir., 113 F.2d 410; Helm & Smith Syndicate v. C. I. R., 9 Cir., 136 F.2d 440; Pennsylvania Co. for Insurance, etc. v. United States, 3 Cir., 138 F.2d 869; Fletcher v. Clark, 10 Cir., 150 F.2d 239; however, where the features of entity ownership (#1) and perhaps of transferability of beneficial interest (#4) were also missing the courts found an "other unincorporated association" not taxed as a corporation, C. I. R. v. Gerstle, 9 Cir., 95 F.2d 587; C. I. R. v. Rector & Davidson, 5 Cir., 111 F.2d 332.

The Treasury Department, in its regulations following the Morrissey case[9] emphasizes particularly the features of centralized management (#2) and continuity regardless of death (#3), to a lesser extent easy transferability (#4), by implication entity ownership (#1), and states that the absence of limited liability (#5) in particular is not determinative.[10] The here pertinent rules have survived several reenactments of the statutory provisions by Congress.

The Morrissey case rejected as a decisive test the presence or absence of particular corporate forms, and substitutes resemblance as to more basic features, five of which it listed—without suggesting that these or any of them are either necessary or sufficient. The problem in that case was to distinguish between "passive" trusts and "business" trusts taxable as corporations, and the tests that the Court suggests all go to the point of whether the trust is being used to achieve the organizational conveniences of the corporate form—in which case it should be taxed as a corporation. As stated above, the case does not deal basically with the partnership-corporation distinction which is the one significant in the present case.

What then are the essential differences between a partnership and a corporation? None of the cases cited by the parties seems to deal directly with this problem, but there apparently is some tendency to refer to the not directly applicable Morrissey list of corporate advantages achieved by use of the business trust in order to distinguish partnership-like organizations from corporations. However, there appears to be a basic difference between the partnership and the corporate form of business enterprise, a distinction that Congress probably had in mind in establishing a dif-

---

9. Regulations 111, Secs. 29.3797—1,2,3,4.

10. Though in the Morrissey case the Court stated that in view of the inadequate statutory definition this is a proper field for administrative regulation, this must still be "within the permissible bounds of administrative construction." [296 U.S. at 354–355, 56 S.Ct. 294.] It does not seem that this is meant to expand the usual limits of rule making but merely permits reference in the administrative definition to features not expressly mentioned in the statute, but which are at least implicit in the distinction it attempts to make.

ference in tax treatment; this difference is referable to the "entity" concept which Congress accepts for corporations and rejects for partnerships.

■ The economic fortunes of and the conduct of the business carried on by a corporation are almost entirely independent of the fortunes of its stockholders Thus (a) a stockholder or all stockholders may die, become bankrupt, sell their interest to others, etc. without affecting in the least the business of the corporation. Similarly (b) the corporation can become bankrupt or acquire great wealth without directly affecting the fortunes of its stockholders—this is achieved by limited liability and the discretion vested in the directors regarding the declaration of dividends; it can greatly expand or contract its business without reference to the economic condition of its stockholders. In short, a corporation is a truly independent business enterprise. A partnership is not so: (a) If one or more of the partners die, become bankrupt, or wish to liquidate their interest in the partnership by sale of their portion or otherwise, the partnership must be reorganized, and frequently this cannot be done without liquidating or greatly changing the entire business or at least its scope; (b) if the partnership becomes insolvent or bankrupt the effect is felt directly and seriously by the partners, nor can a partnership greatly expand its business if the resources of its owners are limited—the taking in of new partners is not a routine matter to the extent that the sale of new stock by a corporation is.

If we now check the significant features of the Guaranty Employees Association against the basic distinction suggested above we find:

1. There is no substantial economic independence of the Association from its members. (a) The business of the Association necessarily expands or contracts as the members find it essential or desirable to deposit or withdraw their investments (though some incorporated open-end investment trusts have the same characteristic); if all members should withdraw their investments (due to a strike or cessation of employer's business, etc.) the Association would have to terminate its business—and perhaps liquidate at a loss. (It might also be noted that though on the death of a member if he had a spouse or children they might maintain his investment in the Association, the relationship between the inheritor and the Association is no longer the same as between it and a member—all that remains is the obligation to pay a proportionate share of the income and to repay the principal on demand—there is no right to increase the investment, to borrow against it, or to vote; in effect a debtor-creditor relationship is created, similar to the arrangement sometimes made upon the death of a partner if the business is carried on by the remaining members and the widow in effect becomes a limited partner). Moreover the Association cannot grow through retained earnings. (b) Since there is no limitation of personal liability as to outside creditors the insolvency or bankruptcy of the Association would directly affect the fortunes of its members; on the other hand the good fortune of the Association would also benefit the members almost immediately.

Thus, in effect, this Association has continuity only of management; continuity of property depends largely on the independent decisions of each of its members. There is not much more than an agency, through which a group of individuals in a joint enterprise can make a temporary, diversified investment. See Helm & Smith Syndicate v. C. I. R., supra, 136 F.2d at 442.

■ It appearing therefore that there is here no truly separate entity whose economic fortunes are in any way independent from the fortunes of the participants, we conclude that the Government has not carried its burden of proving that appellant resembles, in its essential economic features, a corporation more than it does a partnership.

The judgment must be Reversed and Remanded for entry of judgment for appellant.

RIVES, Circuit Judge (dissenting).

Appellant's properties and funds were held by Guaranty Title as trustee. Its management was vested in an Executive Committee of seven members who acted, of course, in a fiduciary capacity. It seems clear to me that the purpose of its members had been to create that kind of savings bank whose affairs are administered by a board of trustees.[1]

The Congress had evidently intended that savings banks "not having a capital stock represented by shares" would be taxable as corporations, unless specifically exempted under § 101(2) of the Internal Revenue Code of 1939. We have heretofore held that the purpose to create no more than a mutual savings bank failed, because appellant was authorized to engage in and actually transacted business foreign to that of a bank. I think it equally clear that appellant was an "association" taxable as a corporation, within the meaning of § 3797(a) (3).[2]

All of us recognize the same cases as controlling on the characteristics an unincorporated organization must possess in order to be taxable as a corporation. Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263; and its companion cases; see also A. A. Lewis & Co. v. Commissioner of Internal Revenue, 301 U.S. 385, 57 S.Ct. 799, 81 L.Ed. 1174. There are a legion of other cases in this field,[3] and no useful purpose would be served by an elaborate survey of any substantial number of them. As we said in Lucas v. Extension Oil Co., 5 Cir., 47 F.2d 65, 66:

"Each of these cases grounds its result upon the controlling facts, and makes it clear that reality, and not fiction, must in each case determine whether the tax is or is not properly laid."

Perhaps the key to a solution can best be reached by considering substance rather than form, inquiring whether in the particular case the organization enjoyed the privileges of doing business in a manner substantially the same as if

1. "§ 832. *Nature and Kinds of Savings Banks.*—There are two distinct kinds of savings banks. What may be termed the first kind is that of the old-style savings bank, an institution in the hands of distinterested persons, the profits of which, after deducting the necessary expenses of conducting the business, inure wholly to the benefit of the depositors, in dividends or in a reserved surplus for their greater security. In such an institution there is no capital stock and there are no stockholders. The bank's affairs are administered by a board of trustees, the securities in which the deposits shall be invested are prescribed by law, and returns are made to public authorities who may examine the institution at any time, so that the conduct of its affairs may be constantly under public supervision. Although termed a bank, it has few characteristics of a commercial bank of discount and deposit, and it is not a banking institution in the commercial sense of that phrase.

"What may be termed the modern style of savings bank is one in which the depositor becomes a creditor of the bank for the amount of the deposit, and receives such interest on the deposit as the trustees or directors of the bank may agree to pay, and in which the profits, after the payment of such interest, belong to the corporation and its stockholders. This is also the corporate setup and relationship in respect of a savings department in a commercial banking corporation thus organized. As a logical consequence, this modern type of savings bank has been regarded as within the operation of statutes imposing a superadded liability upon bank stockholders for the debts of the bank.

"The mere designation of a bank as a savings bank does not make it a savings bank. To determine its character, its organization, powers, and mode of doing business must be looked to." 7 Am.Jur., Banks, § 832.

2. Quoted in pertinent part in footnote 2 to the main opinion.

3. Well reviewed in Mertens Law of Federal Income Taxation (Zimet & Barton Revision), Vol. 7, Chapter 38A, §§ 38A.01–38A.33.

it had been incorporated, and remembering also that, " * * * it is impossible in the nature of things to translate the statutory concept of 'association' into a particularity of detail that would fix the status of every sort of enterprise or organization which ingenuity may create * * *." Morrissey v. Commissioner, supra, 296 U.S. at page 356, 56 S.Ct. at page 295.

That case prescribed three general characteristics to be possessed by an organization before it is an association taxable as a corporation: (1) the actual *association* of two or more individuals in a joint enterprise; (2) for the purpose of carrying on some business; (3) with substantial resemblance to a corporation. See Morrissey v. Commissioner of Internal Revenue, supra, 296 U.S. at pages 356, 357, 56 S.Ct. at pages 294, 295, and see also, 7 Mertens Law of Federal Income Taxation (Zimet & Barton Revision) § 38A.10. In the present case, the association admittedly had the first two characteristics, the dispute centers on the third; that is, the extent to which it resembles a corporation. Some cases have held the resemblance to corporate form to be secondary in importance to the purpose of the organization. Helvering v. Washburn, 8 Cir., 99 F.2d 478, 481; United States v. Davidson, 6 Cir., 115 F.2d 799, 801; Nee v. Main Street Bank, 8 Cir., 174 F.2d 425, 429. Again, however, it seems to me that the key is to be found in whether there is *substantial* resemblance.

In particularizing the salient features whereby a trust can be found to take on corporate resemblance, the Court observed in the Morrissey case, supra, 296 U.S. at page 359, 56 S.Ct. at page 296:

"What then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act 'in much the same manner as directors,' may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking."

We restated those salient features in Commissioner of Internal Revenue v. Rector & Davidson, 5 Cir., 111 F.2d 332, 333:

"They are (1) title to the property held by the entity, (2) centralized management, (3) continuity uninterrupted by deaths among the beneficial owners, (4) transfer of interest without affecting the continuity of the enterprise, and (5) limitation of the personal liability of participants."

It seems to me that appellant had (1) continuity of title in Guaranty Title for its benefit; (2) centralized management by the Executive Committee; (3) continuity uninterrupted by the deaths of any, less than substantially all, of the beneficial owners because the Executive Committee continued in control until final termination of the organization.

True, as has been stated, membership in and the units of appellant organization were nontransferable. Under its method of operation, however, the par value and the actual value of units were kept at approximately the same amount. Withdrawal of memberships and of deposits and the admission of new members and issuance of new units permitted flexible contraction and expansion of interests without affecting the continuity of the enterprise, and substantially supplied feature numbered 4.

In Del Mar Addition v. Commissioner of Internal Revenue, 5 Cir., 113 F.2d 410, 411, we said:

"The fifth characteristic is the limitation of the personal liability of participants. The trust agreement did not specially include such a provision, but the record is clear that it was not included only because, in the judgment of the participants, it was unlikely, due to the nature of the enterprise, that any contingency would arise requiring it."

That is likewise true in the present case. Following the excellent investment practices of Guaranty Title, the employer organization, with which its employees were of course familiar, the evidence shows that the association has never suffered a loss on a single investment. Further, if an individual member executed a note or obligation for the association under the by-laws he would be indemnified "to the extent of its total assets." Under the peculiar facts of this case, the failure to provide for absolutely limited liability did not deprive the association or its members of any substantial right or privilege possessed by a corporate organization. See Bert v. Helvering, 67 App.D.C. 340, 92 F.2d 491, 495.

Finally, the Morrissey case, supra, 296 U.S. at page 354, 56 S.Ct. at page 294, suggested that,

"As the statute merely provided that the term 'corporation' should include 'associations,' without further definition, the Treasury Department was authorized to supply rules for the enforcement of the act within the permissible bounds of administrative construction." 296 U.S. at pages 354–355, 56 S.Ct. at page 294.

It seems to me quite clear that this appellant is an association taxable as a corporation, distinguished from either a trust or from a partnership, within the terms of the applicable regulations, too lengthy to be here quoted. Treasury Regulations 111, § 29.3797—1, 2, 3 and 4.

Of opinion that the judgment should be affirmed, I therefore respectfully dissent.