DONALD W. & RUTH S. ALLEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Allen v. Commissioner
Docket Nos. 19865-87, 3222-88, 13810-88
United States Tax Court
T.C. Memo 1991-452; 1991 Tax Ct. Memo LEXIS 501; 62 T.C.M. (CCH) 741; T.C.M. (RIA) 91452; September 18, 1991, Filed *501 Decisions will be entered under Rule 155. Dixon R. Rich and Dixon R. Rich, Jr., for the petitioners. Carmino J. Santaniello and Joseph F. Long, for the respondent. DAWSON, Judge. PANUTHOS, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These cases were assigned to Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below: OPINION OF THE SPECIAL TRIAL JUDGE By timely notices of deficiency, respondent determined deficiencies in Federal income taxes and additions to tax in these consolidated cases, [3] as follows: Additions to Tax, Sections Docket No.
Petitioners Year
Deficiency
6653(a)(1)
6653(a)(2)
6661(a)
3222-88
Andrew & Geraldine
1981
$ 7,855
$ 398 50% of the
--   Potoczny     interest due
on $ 7,855
19865-87
Donald W. & Ruth S.
1983
7,020
351   50% of the
$ 1,755 Allen      interest due
on $ 7,020
13810-88
Trout Run #3, Dr.
1984
13,439.87
--   --  --   Phillip R. Goyette,
et al., Grantors
*502 Respondent also determined that petitioners in docket Nos. 19865-87 and 13810-88 are liable for additional interest under section 6621(c). The primary issue herein is the characterization of two identical entities, the Morrison Run Trust #1 (the Morrison Run trust) and Trout Run Trust #3 (the Trout Run trust), for Federal income tax purposes. Resolution of this question will determine whether petitioners are entitled to deductions claimed as the distributive share of "losses" incurred by the trusts. [4] Resolution of the central question will also determine whether the Trout Run trust is entitled to the distribution deduction which it claimed under section 651. If the trusts constitute "associations" taxable as corporations for purposes of the Federal tax laws, losses incurred by the trusts do not "pass through" to petitioners but rather must be utilized *503 by the entities themselves on their own Federal tax returns. Similarly, if the trusts are taxable as corporations, they may not claim distribution deductions for amounts distributed to the investors. Also at issue are the additions to tax determined against petitioners under sections 6653(a)(1) and (2) and 6661(a) for the years in question. [5]
FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners Andrew and Geraldine Potoczny resided in Avon, Connecticut, at the time their petition was *504 filed. Petitioner in docket No. 13810-88, Trout Run Trust #3, maintained its principal place of business in Putnam, Connecticut, at the time it filed its petition in this case. Donald and Ruth Allen resided in Bethlehem, Pennsylvania, at the time they filed their petition. All petitioners reported income and deductions for the years in issue on the basis of cash receipts and disbursements. During the years in issue, individual petitioners were the owners of "investment units" in either the Trout Run trust or the Morrison Run trust. Other investors have stipulated to be bound by the decisions rendered in these cases. 1. The Morrison Run Trust #1
On November 5, 1981, the Morrison Run trust was created in accordance with the terms of an agreement entitled "Morrison Run Trust #1" (the Morrison agreement). On that same day, Robert E. Clark (Clark) and Edward J. Sullivan (Sullivan) assigned mineral interests in 15 well sites located on Tract 488 of Pleasant Township, Warren Co., Pennsylvania, to Jon W. Webber, et al. (Webber). On November 9, 1981, Webber executed the Morrison agreement, dated November 5, 1981, with the American National Bank, Hamden, Connecticut, as Trustee *505 (the Morrison trustee) and Jon W. Webber as operator. The agreement was executed by representatives of the Morrison trustee on November 12, 1981. On November 5, 1981, Webber assigned mineral interests in the 15 well sites (previously assigned to him by Clark and Sullivan) to the Morrison trustee, which assignment was properly recorded. The Morrison agreement names Webber as the operator of the Morrison Run trust. Webber did not receive compensation for his service as operator, although he did receive a commission for selling units in the Morrison Run trust. The commission, which totaled 5 percent of the moneys raised by Webber, was paid by Gas and Oil Management Associates, Inc. (GOMA), [6] of Youngstown, Pennsylvania. Clark and Sullivan each owned 50 percent of the stock in GOMA and were officers of GOMA during years 1981 through 1984. Webber was set up as the operator of the Morrison Run trust after he approached Clark and Sullivan about promoting an oil deal. He is not knowledgeable in matters concerning the oil and gas industry. Webber was not an investor in the Morrison Run trust during 1981 or 1982. On or about November 5, 1981, Webber, in his capacity as operator of *506 the Morrison Run trust, entered into an oral management contract with GOMA. A total of 27 investors paid $ 25,000 (or multiples or fractions thereof) for each of 35 units to an escrow account entitled "Morrison Run Trust #1, Escrow Account" at the American National Bank. Aggregate contributions of the 27 investors totaled $ 875,000 and were paid over by the Morrison trustee to GOMA at the time the purchase amounts for all units were deposited. These funds were used by GOMA to drill wells on the trust property. The Morrison agreement is a form document prepared by GOMA with spaces left blank for the insertion of information such as the names of the operator and the trustee. The Morrison agreement lists Webber, doing business as Morrison Run Trust #1, as the grantor of the trust. "Those persons named on schedule A attached hereto, having addresses and unit interest as therein set forth," are identified as parties to the agreement. The beneficiaries of *507 the trust are defined as all persons set forth on schedule A, their heirs, executors, administrators, or assigns. The schedule A documents each contain the name, address, unit interest, Social Security number, and signature of one investor. The documents do not contain language purporting to delegate any authority to Webber, but under part I, paragraph 3(B) of the Morrison agreement, the investors appoint Webber as operator by virtue of having executed the schedule A form. Paragraph 3(B) of the Morrison agreement also names Andrew Hughes as successor operator in the event of the incapacity of Webber. Part II, paragraph 1 addresses the duties and responsibilities of the operator. Under subparagraph (A), the operator is empowered to conduct the trust's drilling and production operations. His authority in this regard is plenary; he may conduct the operations in his sole judgment and discretion. Subparagraphs (B) through (E) further require the operator to maintain satisfactory liability and workers compensation insurance: (B) The operator shall conduct all operations hereunder in [sic] diligent, careful, and workmanlike manner in accordance with good oil field practice and *508 shall comply with the rules and regulations of any governmental agency having jurisdiction and shall use every reasonable precaution to prevent injury to persons or damage to property and maintain in full force and effect public liability insurance in amounts satisfactory to the protection of the beneficiaries. (C) The operator shall have full power and authority to delegate his duties as set forth in the preceding immediate paragraph; provided, nevertheless, that the operator shall not be exonerated or excused from the proper operation or development of the leasehold estates. Further, the operator or his employees shall carry and maintain in full force and effect Workmen's Compensation Insurance to the extent required for full compliance with applicable law and shall carry and maintain in full force and effect public liability insurance to protect the third parties, persons, and properties to the extent that the beneficiaries' interest under this leasehold estate shall not be jeopardized. (D) The operator may, from time to time, hire and maintain employees, attorneys, engineers, and any other personnel that [sic] operator may deem necessary to fully develop the aforesaid leaseholds, *509 including the right to enter into contracts with said party or parties, and operator shall have the final judgment and decision concerning operations pursuant to this agreement, including, but without limitation, matters relating to explorations, drilling, methods of production, marketing of oil and gas, and abandonment of the wells. (E) Operator agrees that he shall drill wells to the producing formation and properly equip the same for pumping, if productive in paying quantities, and shall make all oil runs from production thereon to the Quaker State Refining Corporation or any other firm, individual, or corporation purchasing crude oil and/or gas which in the operator's opinion will bring the best price; and further, operator shall execute the necessary division orders with any purchaser of the production in favor of the trustee for the uses of the beneficiaries under this agreement.
Under paragraph 3(B) of part I, the "beneficiaries * * * have the right at any time to remove the operator by vote of two-thirds of the beneficial interest and to designate a replacement operator by vote of the majority of the beneficial interests." However, as recited above, the operator is *510 authorized to delegate his duties. The beneficiaries of the Morrison trust have not sought removal of the original operator of the trust. The grantor and trustee also acknowledge that the leasehold estates comprising the corpus of the trust are subject to a royalty payment to the lessor of the property in the amount of one-eighth of the proceeds of oil and gas productions. The parties also agree that "Gas Oil and Management Associates, Inc. * * * will receive one-eighth of the proceeds of oil and gas production or from any other source connected with the leased premises during the term of this agreement as consideration for services rendered in purchasing of the leaseholds and in the planning, designing and engineering their development." The duties of the trustee regarding distribution of trust income to the beneficiaries are discussed in part III of the Morrison agreement. Paragraph (A) requires the trustee to distribute the income of the trust to the beneficiaries at least monthly. The distribution is made following payment of all trust obligations, current pumping costs, taxes, accounting, and all other costs as approved by the operator. Additionally, the trustee must retain *511 $ 3,000 as a contingency balance. At least annually, the operator is required to account to the beneficiaries for all disbursements, charges, and discharges made from all income. The operator also has to account to the trustee and the beneficiaries for all funds received from other than oil production, including the sale of equipment, condemnations proceeds and other nonoperating income. A beneficiary of the trust has the "absolute right to assign [his] interest, but shall not make any partial assignment without the consent of the Grantor." With respect to the interpretation of the agreement, part IV provides: (A) This agreement shall not be construed as creating a partnership or joint venture whatsoever, but it is understood that the interests of the parties hereto shall be several and not joint or collective. (B) This agreement and the operations hereunder shall not be construed a partnership for income tax purposes or a joint venture or unincorporated association but each beneficiary hereunder and the parties hereto shall be considered as individuals for the purposes of filing U.S. Income Tax Returns and payment thereof.
Parts V and VI of the Morrison agreement contain *512 provisions relating to the duration and termination of the trust: PART V (A) This trust may be revoked by the consent of all of the beneficiaries hereunder and until such time shall remain in full force and effect as an irrevocable trust except as hereinafter provided. (B) The trustee may at any time or for any reason whatsoever by giving 90 days notice to all of the beneficiaries hereunder, resign as trustee and thereby terminate all of its duties hereunder as trustee. (C) The operator may upon giving 30 days notice to the trustee select a new trustee which must be a competent trust agency with fiduciary responsibility. (D) All of the parties hereto agree that the situs of the within trust shall be in Hamden, Connecticut, and any legal action commenced hereunder shall be in an appropriate court at said situs.
PART VI TERMINATION (A) This trust shall continue for so long as oil is produced on the leasehold estate in commercial paying quantities as determined by the operator. (B) Upon determination by the operator that oil is no longer produced in commercial paying quantities, the operator shall as promptly as feasible wind up operations and sell or otherwise dispose *513 of all equipment and other property owned by the trust and account to the beneficiaries therefor. (C) Upon authorization and approval by vote of three-quarters of the beneficial interests in the trust estate, the trustee may sell or exchange the entire trust estate, or any portion thereof, on the basis so authorized and approved.
The Morrison Run trust did not realize any income from oil production or any other source during 1981, but did realize income from oil production in 1982. On its Federal tax return Form 1041 for the period November 5, 1981, through December 31, 1981, the Morrison Run trust reported a net loss in the amount of $ 542,633. 2. Andrew and Geraldine Potoczny
Petitioners Andrew Potoczny and Geraldine Potoczny were investors in the Morrison Run trust, having paid $ 25,000 for one of 35 investment units in 1981. Mr. Potoczny is an insurance agent who has no training or expertise in the oil and gas industry. Petitioners borrowed $ 15,000 from the American National Bank to finance a portion of the purchase; they have paid this debt in full. The Morrison Run trust is the only trust in which petitioners invested. Petitioners were introduced to the trust *514 as a means of investment by Webber, one of Mr. Potoczny's coworkers. Potoczny relied upon Webber's involvement in other oil trusts to confirm that it was a good investment. Prior to making the investment, Potoczny read the Morrison agreement and asked questions of Webber and another person (Aiden Kenney), who appeared to be familiar with the arrangement. Neither Webber nor Mr. Kenney are tax accountants or attorneys. The questions which Potoczny asked Webber were general in nature and concerned the mechanics and legalities of the arrangement. Petitioners' accountant, William Romani (Romani), also advised petitioners that the trust was a good investment. Although he read a prospectus concerning the oil and gas trust prior to purchasing his interest in the Morrison Run trust, Potoczny was not too attentive to its contents. Despite their inexperience with oil and gas investment, petitioners did not seek the advice of an independent tax adviser concerning the consequences of their investment. Instead, they relied primarily on prior successes of Potoczny's coworkers as an indication that the trust was a good investment. Potoczny's perception of the legal consequences of the investment *515 was drawn from conversations with Webber and Mr. Kenney and not from any material he read with respect to the investment, including the trust document. Petitioners prepared their own Federal income tax return. On lines 29 and 37 of schedule E attached to their 1981 return, they reported their distributive share of the Morrison Run trust net loss in the amount of $ 15,503.80. By notice of deficiency dated November 19, 1987, respondent disallowed this loss on the ground that the Morrison Run trust is an association taxable as a corporation. Respondent also determined that petitioners are liable for the addition to tax for negligence under section 6653(a)(1) and (2). 3. The Trout Run Trust #3
The Trout Run trust was created on December 30, 1983, in accordance with the terms of an agreement entitled "Trout Run Trust #3" (the Trout Run agreement). The Trout Run agreement is nearly identical to the Morrison agreement. The Trout Run agreement recites that, on the same day, Clark and Sullivan assigned a leasehold interest in certain property to the grantor, who is identified as G. Raymond Christensen (Christensen). Christensen was also the original operator of the Trout Run *516 trust. On December 30, 1983, Christensen assigned this interest to the trustee of the Trout Run trust, the Savings Bank of Ansonia (Trout Run trustee). On or about December 30, 1983, Christensen, in his capacity as the operator of the Trout Run trust, entered into an oral management contract with GOMA. Christensen was not an investor in the Trout Run trust during 1983 or 1984. During 1984, 14 investors paid $ 25,000 per unit for each of 17 investment units in the Trout Run trust. [7] Aggregate contributions of the 14 investors totaled $ 425,000 and were retained in an escrow account until contributions for all investment units were deposited. The Trout Run trustee subsequently remitted the funds to GOMA pursuant to its management contract. Like the Morrison agreement, the Trout Run agreement was prepared conforming to the document used by GOMA in setting up oil and gas trusts. The Trout Run agreement lists Christensen, doing business as Trout Run Trust *517 #3, as the grantor. "Those persons named on schedule A attached hereto, having addresses and unit interest as therein set forth," are identified as "beneficiaries." As with the Morrison agreement, the schedule A forms each contain the name, address, unit interest, Social Security number and signature of one investor. Likewise, the investors do not delegate any authority to Christensen in schedule A, but under part I, paragraph 3(B) of the Trout Run agreement, the investors appoint Christensen as the operator of the trust and empower him to make decisions with respect to the operation and management of the trust corpus. Paragraphs outlining the operator's duties and obligations are identical to those present in the Morrison agreement. The Trout Run agreement contains language identical to that in the Morrison agreement with respect to the beneficiaries' right to remove the operator and to designate a replacement operator. The Trout Run trust operator also has identical authority to delegate his duties and obligations. However, language that the delegation of duties does not exonerate or excuse the operator from the proper operation or development of the trust property is not *518 contained in the Trout Run agreement. On or about October 24, 1986, GOMA contacted the beneficiaries concerning selection of a new operator of the trust. This selection was necessitated by the death of Christensen and the incapacitation of Andrew Hughes, who was named in the Trout Run agreement as successor operator. Romani pointed out to Clark and Sullivan that replacement of the operator was necessary so that someone would be available to execute the trust's tax returns. Clark and Sullivan selected Phillip Goyette (Goyette), whom they knew through his investment in other GOMA trusts, to be successor operator. Goyette was also familiar with other Trout Run investors. Sullivan and Clark did not maintain a list of investors at the offices of GOMA; they obtained such a list from either the bank or the trust's accountant, Romani, and mailed to each investor a ballot listing Goyette as the proposed successor operator. The ballot contained a space in which the investor could nominate his own successor. Goyette was selected as the successor operator in this manner. Goyette does not have experience in the oil and gas industry other than as an investor in oil and gas trusts. As with *519 the Morrison agreement, the parties to the Trout Run agreement acknowledge that the leasehold estates comprising the corpus of the trust are subject to a royalty payment to the lessor in the amount of one-eighth of the proceeds of oil and gas productions. GOMA is also entitled to a royalty in the amount of one-eighth of the proceeds of oil and gas production or from any other source connected with the leased premises during the term of the agreement. Under part III of the Trout Run agreement, the trustee is required to distribute the income of the trust to the beneficiaries at least monthly. The trustee must retain $ 3,000 as a contingency balance. Other provisions relating to the operator's obligation to render an accounting of charges and discharges against trust income to the trustee and the beneficiaries are identical to the Morrison agreement provisions on those points. Provisions relating to the assignment of interests are likewise identical to those of the Morrison agreement, as are provisions relating to the interpretation, duration, and termination of the trust. Ansonia, Connecticut, is identified as the situs of the Trout Run trust, and it is specified that any legal *520 action with respect to that trust shall be in an appropriate court at that situs. GOMA sent periodic reports to Trout Run investors. At some point, GOMA undertook to construct capital improvements on the trust property to connect the trusts' operations with the main gas line system. The trusts did not retain sufficient funds to pay for these improvements. In one of its reports, GOMA informed the beneficiaries that it was willing to be reimbursed for these improvements over a period of time from the trust's income. In a subsequent report, GOMA informed the investors of the "debt that they owed for this work." In later reports, prompted by a decrease in crude prices, GOMA informed the investors that GOMA may have to bill the investors personally for costs if trust income is insufficient to cover them. The Trout Run trust did not realize any income from the production of oil or gas, or from any other source, during 1983. On its 1984 Federal income tax return Form 1041, the Trout Run trust claimed operating expense and income distribution deductions. Respondent disallowed these deductions in a notice of deficiency dated March 8, 1988, on the ground that the trust failed to substantiate *521 its claimed operating expense deduction and that the trust is an association to which an income distribution deduction is not allowable. Respondent further determined that the trust is not entitled to a claimed investment credit on 5-year property with a basis in the amount of $ 153,158. [8]
4. Donald W. and Ruth S. Allen
Petitioners Donald W. and Ruth S. Allen were investors in the Trout Run trust. In 1983, petitioners paid $ 25,000 for one of the 17 investment units. Petitioners' check was forwarded to William McDougall (McDougall) at the offices of the Trout Run trustee by Romani, who was their accountant. The Trout Run trust was Allen's first experience with oil and gas investment. He is not a geologist or otherwise experienced in the field of oil and gas. Allen was not provided with *522 a prospectus or other information relating to the investment prior to his purchase of an interest in the Trout Run trust. He did not read the trust agreement until after he purchased an investment unit. Allen received reports concerning the operation of the trust's oil wells from GOMA and financial information from the trust's accountant. Allen also received the reports relating to the cost of the new gas line and possible assessment for trust operating costs. Prior to that time, he was not aware that he could be personally liable for the trust's debts. On occasion, he communicated with the trustee concerning his investment. Petitioners prepared their own Federal income tax return for 1983 and timely filed it with the Philadelphia, Pennsylvania, service center. In his notice of deficiency dated March 24, 1987, respondent disallowed a deduction in the amount of $ 15,991, which petitioners claimed as their distributive share of losses incurred by the Trout Run trust. Respondent also determined that petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6661, and that petitioners are liable for additional interest on a substantial underpayment attributable *523 to tax motivated transactions under section 6621(c). 5. Gas and Oil Management Associates, Inc.
Clark and Sullivan founded Gas and Oil Management Associates, Inc. (GOMA) in the mid-1970s to provide management services to owners of small oil and gas operations. They also formed a partnership, Clark and Sullivan (the Partnership), which acquired both lease and fee interests in oil and gas producing properties. The Partnership also leased property from Quaker State Refining. GOMA itself did not own property, but rather managed properties owned by the Partnership as well as properties owned by other persons. GOMA routinely contracted out drilling assignments, but owned servicing and other heavy equipment to perform other functions. GOMA employed as many as 19 persons to perform these duties. Both Clark and Sullivan are experienced in the field of gas and oil management, including drilling and operations. Clark serves as GOMA's secretary/treasurer, while Sullivan is its president. Both are 50-percent shareholders. Clark and Sullivan decided to promote and develop the gas and oil properties owned by the Partnership. The fee property owned by the Partnership was improved *524 through the construction of an oil line by Quaker State. Clark and Sullivan cooperated in this activity and actually paid a portion of the cost. The line allowed oil to be produced from the property year-round, without regard to weather conditions. Because the lines ended at a Quaker State processing plant, oil produced from the property was usually sold to Quaker State. However, Clark and Sullivan always sought the best price for the oil produced by GOMA. Additionally, Clark and Sullivan installed a gas line to those tracts which produced gas. They did this through an entity they called "Clark and Sullivan Incorporated." Clark and Sullivan Incorporated marketed the gas extracted from the properties. Clark and Sullivan had previous experience promoting oil and gas properties through the use of a trust vehicle. It was their opinion that a trust satisfied concerns of the investors since a trustee was involved and the funds did not end up in the hands of the promoter. Clark and Sullivan utilized the services of the same attorney, Robert Hanson, each time they organized a trust. All trusts set up by GOMA followed a form agreement, which was amended occasionally to correct any *525 shortcomings that became evident during the administration of a prior trust. Attached to the trust document were maps showing the locations of the proposed oil wells. Immediately after a trust was formed, the Partnership assigned an interest in an oil and gas lease to it through the trust's operator. Prior to marketing investment units in an oil and gas trust, GOMA determined the approximate cost of permitting and drilling a given number of wells on a specified tract. This amount would be the total cost of all investment units in the trust. The funds representing the purchase amount of the units were used to drill the wells. If GOMA underestimated the cost, purchasing investors were not obligated to contribute additional funds to cover the excess. Conversely, if it overestimated the costs of drilling, GOMA could keep the difference. Some investors purchased investment units in several different trusts. The trust agreement form provided for the appointment of a named entity to act as trustee. The duties of the trustee were limited to receiving initial funds from the investors, receiving income from the trust operations, paying bills for management of the trust property, and *526 distributing any excess income to the "beneficiaries." It was intended that the trustee act as a custodian for the beneficiaries, so legal title to the trust property was in held the name of the trustee. Sullivan developed a long-standing relationship with William McDougall (McDougall), originally of American National Bank, to serve as trustee for GOMA trusts. When McDougall left the employment of American National Bank and transferred to Savings Bank of Ansonia (later called Great Country Bank), the trustee was changed to reflect the current employer of McDougall. The American National Bank did not have trust powers under Connecticut State law. The bank viewed itself as a "contact officer" between GOMA, the escrow accounts, and the accountant. McDougall personally supervised the trusts' accounts. The trust form also appointed a named person as "operator," whose duty it was to oversee the development and management of the trust corpus. The operator served mostly as a figurehead for the trust: someone to sign the tax returns and someone to whom investors could direct their questions and letters. The selected operator was usually someone known and trusted by the investors; the *527 selection was not based upon the operator's knowledge about oil and gas management. Sometimes a person who wanted to raise money for a trust would be appointed operator for that particular trust. Oftentimes, a person served as operator of more than one trust. Consequently, the operator's duties were delegable, and the operator always entered into oral or written contracts for these services with GOMA. The operator had to maintain a sufficient level of workers' compensation and public liability insurance. Since it managed the wells for several trusts, GOMA found it more efficient to purchase insurance under a master policy, the cost of which was prorated among the insured trust operations. Purchasing insurance in this manner also had the effect of "layering" the coverage, which GOMA saw as beneficial in case of any exposure to liability. GOMA could be fired as the property manager, although this never happened in any of the approximately 17 trusts set up by GOMA in this manner. In consideration for GOMA's assistance in performing all acts necessary to develop the trust property into oil and gas income-producing property, the trust agreement granted GOMA a one-eighth interest *528 in all income derived by the trust. The interest continued even if GOMA were substituted as the property manager. This provision allowed GOMA to share in the "fruits of its labor" should the operator decide to terminate its management agreement following completion of the initial drilling and well setup. Each person purchasing units in an oil and gas trust set up by GOMA was required to execute a "schedule A" form, which was then attached to the original trust agreement. These forms were mailed to the investors, along with a reference copy of the trust agreement, by the trustee for execution after the investors tendered the purchase price for their interest. Clark and Sullivan did not maintain a list of the investors at the GOMA office, and no other person had access to a "master list" of trust investors. The trust investors themselves did not know the identity of other investors, with the exception of miscellaneous information learned through casual conversation. Either Clark or Sullivan, on GOMA stationery, periodically sent update letters or reports to the beneficiaries containing miscellaneous information such as the progress of the work and trends in oil and gas pricing. *529 Sometimes, investors contacted GOMA or visited the well sites as a consequence of receiving this information. These mailings generally accompanied monthly checks to the investors. Romani is a certified public accountant and is the accountant for GOMA and for all trusts set up by GOMA. He is also the accountant for petitioners herein. He suggested ownership in GOMA trusts to petitioners and others of his clients who inquired about desirable investment media. He also sold units to persons who were not his clients. Although Romani did not possess a brokerage license, he was paid a commission of 5 percent for the sale of each investment unit which he secured. He prepared the tax returns for all of the trusts. OPINION The primary issue for decision is whether the Morrison Run trust and the Trout Run trust are taxable as "trusts" for purposes of Federal income taxation or whether they are, as respondent has determined, associations taxable as corporations. Respondent's determinations are presumed to be correct and petitioners have the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Section 7701(a)(3) defines the term "corporation" *530 as including associations, joint stock corporations, and insurance companies. The term association is not further defined in the Code. However, regulations and case law contain factors which are of some assistance. The Supreme Court considered this issue in the seminal case of Morrissey v. Commissioner, 296 U.S. 344, 80 L. Ed. 263, 56 S. Ct. 289 (1935), and its companion cases, Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 80 L. Ed. 278, 56 S. Ct. 285 (1935); Helvering v. Combs, 296 U.S. 365, 80 L. Ed. 275, 56 S. Ct. 287 (1935); and Swanson v. Commissioner, 296 U.S. 362, 80 L. Ed. 273, 56 S. Ct. 283 (1935). The Supreme Court enumerated and applied elements which identify and distinguish associations from other entities, such as trusts and partnerships. The factors which the Supreme Court delineated as determinative are: (1) title to the property embarked in the enterprise held by trustees, as a continuing body, during the existence of the trust; (2) centralized management by trustees, as representatives of beneficial owners, whether selected by or with the advice of beneficiaries or designated in the trust instrument with power to select successors; (3) continuity uninterrupted by death among beneficial *531 owners; (4) means for transfer of beneficial interests and introducing new participants without affecting continuity; and (5) limitation of personal liability of participants to property embarked in the undertaking.
Morrissey v. Commissioner, supra at 359. The Secretary essentially adopted these factors in his regulations. Section 301.7701-2(a)(1), Proced. & Admin. Regs., sets forth the following factors relevant in determining whether an entity is taxable as an association: (i) associates; (ii) an objective to carry on business and divide the gains therefrom; (iii) continuity of life; (iv) centralization of management; (v) liability for corporate debts limited to corporate property; and (vi) free transferability of interests. In Elm Street Realty Trust v. Commissioner, 76 T.C. 803, 809 (1981), we cited the pertinent language of the regulations with respect to associates and business purpose as follows: the absence of either of these essential characteristics will cause an arrangement among co-owners of property for the development of such property for the separate profit of each not to be classified as an association. * * * *532 Characteristics common to trusts and corporations are not material in attempting to distinguish between a trust and an association, and characteristics common to partnerships and corporations are not material in attempting to distinguish between an association and a partnership. For example, since centralization of management, continuity of life, free transferability of interests and limited liability are generally common to trusts and corporations, the determination of whether a trust which has such characteristics is to be treated for tax purposes as a trust or as an association depends on whether there are associates and an objective to carry on business and divide the gains therefrom. * * * [Sec. 301.7701-2(a)(2), Proced. & Admin. Regs.]
Accordingly, we focus on the characteristics of (i) associates and (ii) an objective to carry on a business, since these two characteristics are essential to any association status. Elm Street Realty Trust v. Commissioner, supra at 809. As a preliminary matter, we note that the findings of fact as found above are made without reliance upon the testimony and reports of petitioners' expert witnesses. At trial, petitioners *533 proffered the testimony of George O. Scott and Thomas W. Angerman. Although petitioners established that the witnesses are experts in the field of gas and oil management, respondent objected to the admissibility of the expert reports tendered by the witnesses on the ground that the reports, with the exception of three paragraphs, contain inadmissible opinions. The Court permitted the witnesses to testify, admonishing them that they could not testify as to legal conclusions relating to the trusts. Laureys v. Commissioner, 92 T.C. 101, 125 (1989). The parties were given the opportunity to present arguments on brief with respect to the admissibility of the reports. Rule 702 of the Federal Rules of Evidence allows a witness to testify as to an opinion concerning scientific, technical, or other specialized knowledge where the opinion will assist the trier of fact. We have reviewed the substance of the witnesses' reports and conclude that the opinions go beyond the scope of the witnesses' expertise. The expert reports and the testimony concern application of the income tax regulations to the GOMA agreements. The reports also address the similarity of the agreements *534 to a Model Form Operating Agreement, developed by the oil and gas industry to standardize the use of terms with the intent of creating a joint venture relationship among investors. These findings and opinions, i.e., whether the factors contained in the regulations are present or absent and whether the Model Form agreement results in a joint venture as opposed to a partnership or association, are in themselves legal conclusions. It is the obligation of the Court to review the documents and other evidence relating to the administration of the trusts and decide whether the factors contained in the regulations are present. Laureys v. Commissioner, supra at 129. For this reason, respondent's objection is sustained and the expert reports furnished by Scott and Angerman are not admitted into evidence. The testimony of these witnesses is not considered for purposes of this opinion. Petitioners maintain that their arrangements constitute grantor trusts, taxable under sections 671 et seq. It is well established that the form a taxpayer has chosen to cloak a transaction is not controlling for Federal tax purposes. The substance and not the form of the transaction *535 controls. Commissioner v. Court Holding Co., 324 U.S. 331, 334, 89 L. Ed. 981, 65 S. Ct. 707 (1945); Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935). We must review characteristics of the trust arrangements and the facts of the cases to determine whether sufficient characteristics are present to require the trusts to be treated as associations for tax purposes. We will proceed to discuss the characteristics of the Morrison Run trust and the Trout Run trust. Since (i) associates and (ii) a business objective are essential to association status, and are usually the only factors to distinguish between a trust and an association, we will consider those first. Elm Street Realty Trust v. Commissioner, supra at 809. Petitioners have contested the presence of other factors, which will be taken up in turn. 1. Associates
Although not entirely clear, it appears that petitioners argue that they did not associate themselves together for the purpose of conducting a business. That is, they believe themselves to be separate investors without a mutual objective of conducting a business. In support of their contention, petitioners focus our attention on the *536 "custodial" nature of their relationship with the trustee and argue that these trusts were formed for the protection and conservation of the trust assets. Petitioners are too literal in their interpretation of the term "associates." "Associates" refers to those individuals who possess a beneficial interest in the entity. Morrissey v. Commissioner, 296 U.S. at 356-357; Elm Street Realty Trust v. Commissioner, supra at 813. Accordingly, we have held that persons who were beneficiaries of a trust established under the grantor's will were not "associates," even though the trust at issue actively continued the grantor's business. Bedell v. Commissioner, 86 T.C. 1207, 1219 (1986). We based our conclusion on the fact that the beneficiaries had not "plan[ned] a common effort or enter[ed] into a combination for the conduct of a business enterprise," as required by the Morrissey opinion. Bedell v. Commissioner, supra at 1219; Morrissey v. Commissioner, supra at 357. See also Blair v. Wilson Syndicate Trust, 39 F.2d 43, 46 (5th Cir. 1930), affg. 14 B.T.A. 508 (1928); *537 Elm Street Realty Trust v. Commissioner, supra.
In the present cases the investors were not gratuitous recipients of interests granted by a common party, nor did they own the trust corpus jointly prior to the formation of the trusts. Instead, they voluntarily purchased interests in oil and gas trusts set up by GOMA as a means of investing in the business to be operated with the trust corpus. The fact that petitioners had no experience in oil and gas weakens rather than supports their arguments. Like shareholders of a corporation, the investors are not intimately involved in the ongoing business of the trust. Similarly, they do not necessarily know the identity of other investors, although all are aware that additional investors exist. Second Carey Trust v. Helvering, 75 U.S. App. D.C. 263, 126 F.2d 526, 528 (D.C. Cir. 1942), affg. 41 B.T.A. 800 (1940). Because they voluntarily associated themselves together for the purpose of developing the trust corpus for profit, we reject petitioners' construction of the regulations and find that the investors of the Morrison Run trust and the Trout Run trust were associates of those entities. 2. *538 Objective to Carry on Business and Divide the Gains Therefrom
A trust has a business objective if it is created to enable the parties to carry on a business enterprise and divide the gains which accrue from the common enterprise. Morrissey v. Commissioner, supra at 359. We look to the trust document to determine the purpose for which a trust entity is formed. The purpose cannot be different or narrower than provided by the document. Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 373-374, 80 L. Ed. 278, 56 S. Ct. 285 (1935). In the Morrison and Trout Run agreements, the duties of the operator are outlined in terms of the business of the trust: the proper development and operation of oil wells on the oil lease which constitutes the corpus of the trust. The operator is given all powers and authority to conduct such operations. The life of the trust is also defined in terms of its profitability. At the time when the trust corpus ceases to produce oil in "commercial paying quantities," the operator is empowered to wind up the operation and to dispose of the trust assets. While the trustees' duty was confined to the collection of income, payment of bills, *539 and distribution of excess profits to the beneficiaries, it cannot be said that the sole purpose of these trusts was the collection of income. Such an approach does not consider the role played by the operator and his delegate, whose purpose it was to improve and develop the trust corpus into oil and gas income-producing property. Since the trustee did not have discretion to invest trust assets or income in other income-producing vehicles, the only income which the trusts could be expected to receive derives from successful drilling and pumping activities on the trust property, or from the sale of the trusts' capital assets. Thus, these trusts are distinguishable from that at issue in Caswal Corp. v. Commissioner, T.C. Memo 1960-143, where we held that a trust which only collected income and made incidental repairs as necessary to rental property did not engage in a business. See also Lewis & Co. v. Commissioner, 301 U.S. 385, 388, 81 L. Ed. 1174, 57 S. Ct. 799 (1937). The investors purchased interests in the trusts as a means of investment. Petitioners testified of their concerns that the trusts were "good investments," and how they purchased interests only after *540 satisfying themselves that this was the case. They clearly were interested in making a profit, and many contacted the accountant, operator, or GOMA to discuss the profitability of their investment. Indeed, some of the GOMA trusts were profitable following the initial period of organization and setup, and continued for many years. For these reasons, we conclude that the Morrison Run trust and the Trout Run trust were formed with an objective to carry on business and divide the gains therefrom. 3. Continuity of Life
At this point, we note that our findings thus far are sufficient to conclude that the Morrison Run trust and the Trout Run trust are not grantor trusts for purposes of Federal income taxation. However, petitioners challenge the presence of several additional factors, which are relevant in distinguishing an association from an entity taxable as a partnership. Therefore, we will address the remaining factors to determine whether the trusts are associations taxable as corporations as opposed to some other form of flowthrough entity. Petitioners argue that the Morrison Run and Trout Run trusts do not possess the corporate characteristics of continuity of life. Continuity *541 of life is addressed at section 301.7701-2(b), Proced. & Admin. Regs. An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization. An agreement may provide that the organization is to continue for a specified period of time or until the completion of a stated task without depriving an organization of continuity of life. However, if the agreement provides that the organization can be terminated by the will of any one member, the organization lacks continuity of life. Sec. 301.7701-2(b), Proced. & Admin. Regs.; Hynes v. Commissioner, 74 T.C. 1266, 1281 (1980). The agreements for both trusts address termination at part V, paragraph (A) and at part VI. These provisions state, first, that the trust may be revoked by consent of all beneficiaries. There is no provision under which any one member may terminate the trust's existence, nor do the provisions address the effect which the death of one beneficiary has on the continuance of the entity. However, because the trust agreements define "beneficiary" as including the heirs, executors, or administrators *542 of a person listed on schedule A, we conclude that the documents do not intend for the death of a beneficiary to dissolve the entity. Second, part VI states that the trust will continue for "so long as oil is produced on the leasehold estate in commercial paying quantities." The operator is given authority to make this determination and, if such a determination is made, the trustee may be empowered to sell or exchange the entire trust estate upon authorization and approval by vote of three-fourths of the beneficial interests in the trust. Petitioners argue that this amounts to the authority of "one member" to unilaterally terminate the agreement. We think that "member" as used in the regulations discussing continuity of life refers to associates, who are persons owning a beneficial interest in the trust's profits or future income. The operator, under petitioners' argument, is the "agent" of the beneficiaries and petitioners would impute the authority of the agent to his principal to require a finding that there is no continuity of life. If each beneficiary had his own separate "agent," we would perhaps further consider petitioners' argument. However, under the present facts, *543 the operator would be the agent of all beneficiaries and, as such, the exercise of his authority to terminate could not be attributed to any one beneficiary. Since the operator of the trusts stands in a contractual relationship with the trust and its beneficiaries (a fact more than emphasized by petitioners) and is not a beneficiary himself, his ability to exercise business judgment to terminate trust operations when continuation of such is not feasible does not render the trust's life noncontinuous. Accordingly, we conclude that the Morrison Run trust and the Trout Run trust have the corporate characteristic of continuity of life. 4. Centralization of Management
Petitioners also challenge the presence of this characteristic. Centralization of management exists when any person, or any group of persons which does not include all the members, has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the entity was formed. These persons may or may not be members of the organization and may hold office as a result of a selection by the members from time to time, or may be self-perpetuating. Centralized management *544 is not present when the central authority is merely to perform ministerial acts as an agent and at the direction of a principal. Centralized management means a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of the organization. Sec. 301.7701-2(c), Proced. & Admin. Regs.; Hynes v. Commissioner, supra at 1282. Petitioners contend that this feature is not present since the trustees of the Morrison Run trust and the Trout Run trust are empowered to perform only ministerial functions, i.e., to receive income generated by oil and gas activities on the trust property, to pay bills as remitted by the operator or his delegate, and to distribute remaining funds to the beneficiaries. They further argue that the operator does not represent centralized management since he has no fiduciary duty to the beneficiaries and is merely their agent. The Court notes, however, that the delegation provision contained in the Morrison agreement reads as follows: (C) The operator shall have full power and authority to delegate his duties as set forth in the preceding *545 immediate paragraph; provided, nevertheless, that the operator shall not be exonerated or excused from the proper operation or development of the leasehold estates. * * * [Emphasis supplied.]
Whether the manager stands in a fiduciary relationship to the members of the organization is not relevant to determining whether centralization of management is present. The fact that the manager can be removed by the members is likewise immaterial, since even directors of a corporation can be removed by shareholder vote. The essence of centralized management is that the members may assign their right to make decisions with respect to the organization's business to a central figure, who has authority to act without their approval. Each of the investors in the Morrison Run and Trout Run trusts delegated all authority to conduct oil and gas operations to the operators of the trusts. The operators are not required to seek approval of the investors for routine decisions, such as payment of bills, or for extraordinary decisions, such as where to drill a new well. The operators transferred their authority to conduct the trust's business to GOMA, pursuant to provisions authorizing such *546 blanket delegation of duties without prior approval of the investors. The presence of an operator in the trusts' structure enables the investors to partake in the trusts' business without having to be concerned with daily decisions. The investors in fact do not conduct the ongoing affairs of the trust. For these reasons, we conclude that the Morrison Run trust and the Trout Run trust have the corporate characteristic of centralized management. 5. Free Transferability of Interests
Free transferability exists where each of an entity's members has the power, without the consent of other members, to substitute for himself a person who is not a member of the entity. Sec. 301.7701-2(e), Proced. & Admin. Regs.; Hynes v. Commissioner, supra at 1285. Transferability of interests in the Morrison Run trust and the Trout Run trust is addressed in the trust agreements at part II, paragraph G: (G) Beneficiaries have the absolute right to assign their interest, but shall not make any partial assignment without the consent of the Grantor.
Thus, the investors have the unrestricted right to assign their interest in whole. We consider the restriction on assignment *547 of partial interests insufficient to render the interests not freely transferable. Accordingly, we conclude that the Morrison Run trust and the Trout Run trust possess the corporate characteristic of free transferability of interest. 6. Liability for Corporate Debts Limited to Corporate Property
Finally, the presence or absence of this characteristic is the subject of much discussion in petitioners' briefs. An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Sec. 301.7701-2(d)(1), Proced. & Admin. Regs.; Hynes v. Commissioner, supra at 1283. In Hynes, we interpreted this requirement as focusing on the beneficiary's liability, rather than on the liability of the trustee, who, under general trust law, may be liable for trust debts. In judging whether there is liability, we look to the liability of the participants or beneficiaries of the trust. Morrissey v. Commissioner, supra at 359; Hynes v. Commissioner, supra at 1283. The trust documents identify the situs of *548 the trust property as Connecticut; however, the trust property (i.e., the oil/gas leases) is real property located in Pennsylvania and oil and gas wells were permitted and operated under Pennsylvania law and regulations. Thus, examination of both Connecticut and Pennsylvania authorities could be helpful. We have reviewed the Pennsylvania authorities cited by petitioners and find them indeterminate of the question at hand. Our own review of the Connecticut and Pennsylvania authorities does not disclose any decisions addressing the liability of investors in a business trust. While statutes may place liability on the "owners" and "operators" of a "well," we do not accept petitioners' apparent argument that the statute refers to petitioners individually and not to the trusts through which they possess an ownership interest in the well. See, e.g., Pa. Stat. Ann. tit. 58, sec. 601.201 (Purdon 1991). We have found that all other factors which distinguish associations from partnerships are present in these trusts. Thus, the absence of this factor will not change the result in favor of petitioners herein. Accordingly, we decline to make a finding on this specific characteristic. The *549 absence of this characteristic would not otherwise prevent a finding of association status in light of the presence of so many other factors, including those essential to association status. Cooper v. Commissioner, 262 F.2d 530 (10th Cir. 1958), affg. a Memorandum Opinion of this Court; Bert v. Helvering, 67 App. D.C. 340, 92 F.2d 491 (D.C. Cir. 1937), affg. 34 B.T.A. 805 (1936); Outlaw v. United States, 204 Ct. Cl. 152, 494 F.2d 1376 (1974). We hold that the Morrison Run trust and the Trout Run trust are associations taxable as corporations and not as trusts or partnerships. Consequently, losses incurred by those entities are not passed through to their investors and neither can the entities claim deductions for distributions made to the investors pursuant to section 642. 7. Additions to Tax
Respondent also determined that the Allens and the Potocznys are liable for additions to tax for negligence computed under section 6653(a)(1) and (2). For purposes of section 6653, negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the *550 circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In their brief, petitioners argue that they were not negligent in light of the fact that "the Internal Revenue Service has audited various trusts' and beneficiaries' returns involving similar, if not identical, grantor trusts for prior tax years and concluded in all instances, after full disclosure of all pertinent facts, that the entities were properly classified as grantor trusts and, actually issued 'no change' letters in connection with some of the examinations." They also point to the fact that no other adjustments were made as establishing they were careful in the preparation of their returns. We cannot agree with petitioners' conclusions. From the record, it is unclear that any petitioners had knowledge of previous audits and, if they did, when they obtained such knowledge. Although they asked Romani about their investment, petitioners' questions appear to have been general in nature and did not address specific details of the trusts' status. We acknowledge petitioners' long-standing relationship with Romani and the fact that they reported the trust income or losses consistent with *551 documents they received from Romani, who also served as the trusts' accountant. However, petitioners' failure to make a meaningful investigation beyond the promotional materials supplied by sales persons and their failure to contact independent advisers was not reasonable or in keeping with the standard of ordinarily prudent persons, especially considering petitioners' lack of experience with this investment and Romani's obvious interests. LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990). Although the question whether the trusts were taxable as associations is somewhat technical, petitioners nevertheless had an obligation to consult an independent adviser to confirm the information which they received from persons having a financial stake in their investment. Seykota v. Commissioner, T.C. Memo 1991-234. For these reasons, we sustain respondent's determination that petitioners are liable for additions to tax for negligence computed under section 6653(a)(1) and (2). Respondent also determined that the Allens are liable for the addition to tax for substantial understatement of tax under section 6661(a). [9] Section 6661 imposes an addition *552 to tax when there is a substantial understatement of income tax for a taxable year. Sec. 6661(a). A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 5,000. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501 (1989); Woods v. Commissioner, 91 T.C. 88 (1988). Although the statute provides for reduction of the understatement in two situations, it is clear from the record that neither is present herein. A review of the returns filed *553 by the trusts and petitioners herein does not reveal disclosure as intended by section 6661(b)(2)(B). See sec. 1.6661-4(b), Income Tax Regs.; Rev. Proc. 84-19, 1984-1 C.B. 433. Further, petitioners did not satisfactorily establish that they relied upon substantial authority for their position. As we have already discussed, reliance on general information without further investigation and confirmation does not rise to the level of substantial authority. Since we have otherwise sustained respondent, we accordingly sustain respondent's determination that the Allens are liable for additions to tax for substantial understatement of tax liability computed under section 6661. To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Andrew and Geraldine Potoczny, docket No. 3222-88; and Trout Run #3, Dr. Phillip R. Goyette, et al., Grantors, docket No. 13810-88.↩
2. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. These cases were consolidated for purposes of trial, briefing, and opinion by order of the Court dated February 2, 1990, which granted the parties' joint motion.↩
4. Our use of "trust" and related terms throughout this opinion is not necessarily to be construed as a finding that the entities in question herein are, or are not, valid trusts recognizable for Federal income taxation purposes. Rather, the use of such terms is only for convenience.↩
5. Respondent concedes that petitioners in docket Nos. 19865-87 and 3222-88 are not liable for additional interest on substantial underpayments attributable to tax-motivated transactions, computed under sec. 6621(c).↩
6. Relevant details concerning GOMA are discussed infra↩.
7. Some investors purchased more than one investment unit.↩
8. Substantiation of the claimed operating expenses for the period December 30, 1982, through December 31, 1983, and for the year 1984 is not at issue. Respondent has also conceded the investment tax credit adjustment.↩
9. Sec. 6661 was repealed effective for returns the due date of which (determined without regard to extensions) is after December 31, 1989, by sec. 7721(c) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-236, 103 Stat. 2106, 2395.↩